**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MELITA SHANNON, | ) | CASE NO.  1:12-CV-953 |
|     obo K.J.S., | ) | |
| | ) | |
|         Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
|         v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
|    Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
|         Defendant. | ) | **ORDER** |

Plaintiff, Melita Shannon ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's son, K.J.S. ("Claimant"), for Supplemental Security Income

("SSI") under Title X VI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

On April 14, 2009, Plaintiff filed an application for SSI on behalf of Claimant,

alleging a disability onset date of January 1, 2008.  (Tr. 14.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id*.)  On August 12, 2011, an ALJ conducted

Claimant's hearing.  (*Id*.)  Claimant participated in the hearing and was represented by

an attorney.  (*Id*.)  Plaintiff also participated in the hearing.  (*Id*.)  On August 23, 2011, the ALJ found Claimant not disabled.  (Tr. 14-26.)  On February 23, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On April 19, 2012, Plaintiff filed a complaint on behalf of Claimant to challenge the Commissioner's final decision.  (Doc. No. 1.)  On September 11, 2012, Plaintiff filed her Brief on the Merits.  (Doc. No. 17.)  On October 26, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 18.)  Plaintiff did not file a reply brief.

Plaintiff asserts that substantial evidence supports the conclusion the claimant is markedly limited in at least two domains of functioning and, therefore, is disabled.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Claimant was born on April 12, 1999 and was a school-age child on the date Plaintiff filed his application for SSI and on the date of his administrative hearing.  (Tr. 17.)  He had not engaged in substantial gainful activity at any time relevant to the disposition of his application.  (*Id*.)

### B.    Medical Evidence

On April 10, 2009, Claimant was examined by a social worker at Beech Brook, who noted Plaintiff's report that Claimant "ha[d] anger issues," learning problems and poor peer relations.  (Tr. 339.)  Claimant, who was in third grade and was about to turn ten years old, had been held back a grade and verbalized that he wanted to commit suicide.  (*Id*.)  A school psychologist had recently diagnosed Claimant with dyslexia.

2

(Tr. 341.)  Claimant was earning D's and F's in school.  (*Id.*)  Claimant reported that he wanted to play football and enjoyed playing video games.  (*Id.*)  He was happiest socially when he played basketball.  (Tr. 349.)  Plaintiff reported that, while Claimant related well to his younger sister, he had "[l]ots of conflict" with his 13-year old brother, and had no close friends.  (Tr. 342.)  The social worker noted that Claimant's mental status was unremarkable, that he was withdrawn, and that he had infrequent homicidal ideation, frequent suicidal ideation, psychomotor retardation, soft speech, and constricted affect.  (Tr. 347-49.)  The social worker reported that Claimant was "quick to anger" and had recently grown "more defiant of authority figures (such as teachers)." (Tr. 349.)  He had reportedly thrown a knife at his older brother when angry.  (*Id.*) The social worker diagnosed Claimant with major depressive disorder (single episode), oppositional defiant disorder, and learning disorder (not otherwise specified).  (Tr. 350.) She noted that Claimant had asthma.  (*Id.*)  The social worker recommended that Claimant receive individual outpatient counseling, noting that Plaintiff did not yet want to try medication.  (Tr. 350-51, 357-58.)

On September 5, 2009,[1] Plaintiff and Claimant returned to Beech Brook, where Plaintiff was examined by Thomas D. Eppright, M.D.  (Tr. 477-79.)  Plaintiff reported that Claimant was distracted and easily frustrated, and had tantrums.  (Tr. 477.) Claimant denied any suicidal or homicidal thoughts.  (Tr. 478.)  Dr. Eppright noted that Claimant was cooperative but distracted, hyperactive with halting speech, and had a

---

[1]  There are no records in the administrative transcript reflecting that Claimant participated in the weekly counseling sessions recommended by the social worker in April 2009.

blunt affect and fair insight and judgment.  (*Id.*)  Dr. Eppright diagnosed Plaintiff with attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder.  (Tr. 479.)  He assigned Claimant a Global Assessment of Functioning ("GAF") score of 55 and prescribed Claimant Adderall.  (*Id.*)

On September 18, 2008, a psychology assistant at Applewood Center ("Applewood") performed a mental health assessment of Claimant.  (Tr. 643-57.)  The assessment reflects that Plaintiff brought Claimant to Applewood for treatment "because of behavior problems at home and school."  (Tr. 643.)  The assessment notes that Dr. Eppright had prescribed Adderall for Claimant, but reflects that Claimant was not compliant with taking it.  (Tr. 649.)  Plaintiff reported to Applewood staff that Claimant was depressed for no apparent reason, displayed anger and aggression when did not get his way, constantly defied her and his teachers, experienced mood swings and feared that "people are trying to get him," did not pay attention to her or to his teachers, and experienced mood swings and nightmares that caused him to fear going to sleep.  (Tr. 651.)  She reported that Claimant had spoken of hurting himself and others, and had often tried to injure his siblings in fits of rage.  (Tr. 653.)  Plaintiff explained that she did not believe that the counseling at Beech Brook was helping Claimant, and that she had not given him the Adderall because she did not believe that he had ADHD.  (Tr. 654.)  Applewood staff diagnosed Claimant with disruptive behavior disorder (not otherwise specified), ADHD and depression, and assigned him a GAF score of 50.  (Tr. 655.)  They recommended that Claimant receive treatment for depression, that he undergo a psychological evaluation, and that his aggressive, violent and suicidical behaviors be monitored.  (Tr. 656.)

4

During a September 23, 2009 session, an Applewood staff member discussed anger management skills and self esteem with Claimant, and recommended that Claimant undergo weekly behavioral counseling sessions.  (Tr. 613-17.)

On September 30, 2009 Applewood psychology assistant Heather F. Marcinick, MA, performed a psychological evaluation of Claimant.  Tr. 620-42.)  Ms. Marcinick diagnosed Claimant with moderated, single-episode major depressive disorder.  (Tr. 632.)  She recommended that he undergo cognitive behavior therapy and interpersonal psychotherapy; consult with a child/adolescent psychologist regarding using medication to treat his depression; and continue to pursue individual therapy to address his depression, irritability and low self esteem.  (Tr. 632.)  She also recommended that Claimant's family undergo family therapy to "explore family patterns which may contribute to [Claimant's] functioning and to enhance family interactions."  (Tr. 633.) Ms. Marcinick noted that Plaintiff reported problems with Claimant's attention and impulsivity, but opined that, because these symptoms were not reported prior to the onset of Claimant's depression, they did not merit separate diagnoses.  (Tr. 632.)

On October 17, 2009, Dr. Eppright examined Claimant at Beech Brook and noted that Claimant had not yet started to take Adderall.  (Tr.  480.)  Plaintiff asked questions about using the medication and whether it would be effective.  (*Id*.)  Dr. Eppright noted that the "goal is currently to continue medication of Adderall."  (Tr. 480.) On November 20, 2009, Claimant, Plaintiff, Beech Brook staff and Claimant's teacher, Gail K. Bencha, developed an Individual Service Plan ("ISP") for Claimant, with therapeutic goals of: reducing the frequency and intensity of depressive and angry symptoms; reducing the intensity and frequency of hostile and defiant behaviors toward

5

adults; and working with mental health professions to learn how to gain control over his symptoms and behaviors.  (Tr. 481-86.)  The ISP required family and individual therapy sessions, as well as psychiatric assessments and consultations every 90 days.  (Tr. 481-84.)

On January 4, 2010, Plaintiff reported to Applewood staff that Claimant continued to experience angry outbursts, having recently destroyed his bedroom furniture and cut up his own clothing.  (Tr. 619.)  On January 7, 2010, Ms. Marcinick completed an addendum to her September 30, 2009 report after receiving a behavior assessment from Claimant's fourth-grade teacher.  (Tr. 620-24.)  Ms. Marcinick noted that Claimant's teacher had not reported "any significant problems with internalizing or externalizing problems occurring within the school setting," but had described Claimant as "becoming easily upset, frustrated and angered in response to environmental changes, reacting negatively when faced with changes in everyday activities or routines, and having difficulty overcoming stress and adversity."  (Tr. 621.)  Ms. Marcinick opined that the teacher's report further ruled out "concerns about ADHD and a Disruptive Behavior Disorder, as no significant problems with attention, hyperactivity, aggression or rule-breaking behavior were endorsed as occurring within the school setting."  (*Id*.)

At a quarterly ISP review conducted on January 23, 2010, Beech Brook staff noted that Claimant had reported suicidal thoughts during a recent family counseling session.  (Tr. 487.)  Beech Brook staff reported that Claimant had made "minimal progress" in his ISP goals, noting that Claimant had attended his therapy appointments "infrequently" due to "holidays and family cancellations."  (Tr. 489.)  Claimant continued

to struggle to maintain his anger and hostility, depressive symptoms, suicidal ideations and temper outbursts at home and school.  (Tr. 488, 489.)  Beech Brook staff noted that, after Claimant began taking Adderall, Plaintiff reported no improvement in his behavior, whereas Claimant's teacher reported "major improvements" in Claimant's concentration, impulsive behavior and overall ability to manage his behavior.  (Tr. 488.)  The staff reported that Plaintiff had cancelled a November 2009 appointment to follow up on Claimant's medication and had not rescheduled.  (*Id.*)  According to the ISP review:

> [Claimant] continues to exhibit the following symptoms which interfere with his emotions, academic and social functioning: suicidal thoughts/self-injury behavior, depressed mood, low self esteem, problems with anger related to learning, problems with peers and authority figures, and witness to past domestic violence between [his parents].

(Tr. 489.)  Beech Brook staff recommended that Claimant continue with the treatment described in his ISP.  (*Id.*)

On March 22, 2010, Plaintiff reported to Applewood staff that Claimant continued to display aggressive behaviors at school.  (Tr. 612.)  Claimant stated that he felt the his self esteem had improved.  (*Id.*)

On April 24, 2010, Dr. Eppright examined Claimant at Beech Brook and observed that Claimant was, "for the most part . . . doing reasonably well," noting less impulsivity, distractibility and hyperactivity "on current medication."  (Tr. 493.)  Claimant reported no suicidal or homicidal thoughts.  (*Id.*)  Dr. Eppright observed that Claimant's thoughts were "goal directed" and that his grades had improved.  (*Id.*)  Dr. Eppright

7

recommended that Claimant continue taking Adderall and Abilify,[2] and follow up in one month.  (*Id*).

On May 17, 2010, Applewood staff recommended that Claimant continue weekly counseling, with the goals of decreasing his aggression and improving his self esteem. (Tr. 603-09.)

On January 18 and 19, 2011, Plaintiff and Claimant met with Beech Brook staff to review his ISP.  (Tr. 681-91.)  Beech Brook staff noted Plaintiff's report that Claimant was "doing consistently well at home and in school," was "completing his chores in a timely manner, active in community activities, getting along with his siblings and controlling his anger much more effectively than he ha[d] in the past."  (Tr. 690.)  A Beech Brook social worker noted that Claimant had "reached a point where he can accept direction from adults without arguing and is much more reasonable with requests."  (*Id*.)  Claimant reported that he had joined the neighborhood community center basketball team, and that he was getting along well with his siblings.  (Tr. 688.) The social worker noted that Claimant has been suspended from school in October 2010 after fighting with another student, but had not had any problems since then.  (Tr. 681.)  The review reflects that Claimant had stopped taking his medications, and had not attended any appointments with Dr. Eppright "in months."  (Tr. 682.)  However, Claimant was not having any angry outbursts, and the social worker and Plaintiff discussed discharging Claimant from Beech Brook's care at the next review of his ISP.

---

[2]  The record of Dr. Eppright's April 24, 2010 reflects that Dr. Eppright instructed Claimant to "continue" Abilify.  (Tr. 493.)  However, there are no records in the administrative transcript reflecting when Claimant began taking that medication.

(*Id.*)

On February 19, 2011, a social worker from Murtis Taylor Human Services assessed Claimant at the request of Plaintiff.  (Tr. 716-28.)  Plaintiff reported that Claimant was easily angered, aggressive, destructive and violent when angry.  (Tr. 716.)  Plaintiff reported that she felt that Claimant's medication dosages were too low because they were not helping.  (*Id.*)  Plaintiff stated that Claimant's mood swings had increased, that he was frequently depressed, and that he had attacked his siblings and and harmed himself.  (Tr. 721, 723.)  Claimant reported that he heard voices in his head telling him to harm others when he was angry.  (Tr. 723.)  The social worker diagnosed Plaintiff with major depressive disorder with psychotic features, and oppositional defiant disorder.  (Tr. 727.)  She recommended that Claimant undergo a psychological evaluation and counseling.  (Tr. 725.)

On April 11, 2011, Dr. Eppright examined Claimant, noting that Claimant was "doing well on" Adderall and Abilify.  (Tr. 680.)  Dr. Eppright observed that Claimant had no suicidal or homicidal thoughts, and that his thoughts were goal directed.  (*Id.*)  He recommended that Claimant continue the medications and follow up with him in one month.  (Tr. 680.)

On April 18, 2011, Claimant was admitted to Fairview Hospital's Pediatric Child and Adolescent Psychiatry Unit ("Fairview") after he threatened his brother with a knife and locked himself in his bedroom.  (Tr. 694.)  Fairview records reflect that Plaintiff reported that Claimant had struggled with police officers called to the scene, while Claimant denied any struggle occurred.  (*Id.*)  Claimant reported to psychologist Joseph Austerman, D.O., that his mood was "good" most of the time and that he experienced

9

episodes of anger about once each week.  (*Id*.)  He claimed that he had not actually intended to harm himself or his brother.  (*Id*.)  Psychologist Deepa Mainpalli, M.D., diagnosed Claimant with mood disorder (not otherwise specified), ADHD and oppositional defiant disorder.  (Tr. 701.)  Progress notes from Claimant's admission at Fairview reflect that he fully participated in therapy activities, was "pleasant, cooperative and social," and assisted in clean up.  (Tr. 704-05.)

Claimant's therapist at Fairview determined that he had severe impairments in: the self care skills of safety and stress management; the mental functions of problems solving, judgment, decision making, and impulse control; and the psychosocial skills of relationship skills, assertiveness and self-expression.  (Tr. 707-08.)  The therapist determined he was moderately limited in: the self care skills of sleep, time utilization, coping and life balance; the specific mental functions of concentration, attention span, and insight; and the psychosocial skill of self-concept.  (*Id*.)  The therapist determined Claimant was moderately impaired or within normal limits in: the self-care skills of grooming, hygiene, interdependency, and medication management; the specific mental functions of following directions, cognitive flexibility, memory, reality awareness, comprehension, task organization, perceptual function and awareness; and the psychosocial skills of sociability, behavior, empathic ability, maturity, listening skills, self-esteem, body image, self-concept, motivation, communication, and cooperation. (*Id*.)

In a June 1, 2011 ISP review, Beech Brook staff noted that Claimant had been suspended from school in March 2011 for fighting with a peer.  (Tr. 736.)  The staff observed that Claimant's mood swings had recently increased in intensity and that,

although he had been making progress in controlling his aggression and angry outbursts, the intensity and frequency of his outbursts had recently increased.  (Tr. 737.)  Plaintiff reported that, for the two weeks prior, Claimant had been experiencing angry outbursts with his siblings, and refusing to comply with "reasonable requests." (Tr. 738.)  Beech Brook staff noted that Claimant was having "significant trouble controlling his emotions, his anger and his aggressive and destructive behaviors."  (Tr. 739.)  Staff noted that physicians at Fairview had increased Plaintiff's dosages of Adderall and Abilify.  (Tr. 736, 741.)  Beech Brook staff recommended that Plaintiff receive behavioral health counseling and psychiatric supportive treatment four times each month.  (Tr. 730.)[3]

### C.     Information and Reports from Claimant's School

In an individualized education plan ("IEP") report prepared on January 30, 2009, staff at Hope Academy, where Claimant was in third grade, noted that Claimant participated in class discussions and activities and volunteered to read during class. (Tr. 520.)  According to the report, when he focused and "slowed down," Claimant was "able to complete his work and receive high marks."  (*Id*.)  According to the report, a December 2007 standardized test reflected that Claimant functioned in the low average range of intelligence, and in the borderline range verbal ability.  (Tr. 521.)

A January 21, 2010 IEP report, completed when Claimant was in fourth grade, noted that Claimant had improved in writing and was making "steady progress" in

---

[3]     In the ISP, Beech Brook staff noted that, after his April 2011 hospitalization, Claimant had seen Dr. Eppright on a monthly basis.  (Tr. 737.)  The administrative transcript, however, contains no records of these examinations.

11

following grade-level instructions.  (Tr. 670-71.)  He could complete one to two step instructions when given verbal and visual prompts, but required assistance to follow multi-step instructions and to stay on task.  (Tr. 671.)  Claimant continued to require assistance in reading and comprehending grade level passaged.  (Tr. 672.)  Claimant "benefits when passages are read to him first, then he is given an opportunity to read it for himself."  (*Id*.)  He was showing "steady progress" in formulating simple sentences.  (Tr. 673.)

In May 2010, Ms. Bencha completed a teacher questionnaire, noting that she was Claimant's fourth grade teacher, and saw him every day of the school week.  (Tr. 286.)  She stated that Claimant was performing at the second-grade level in reading, math and written language.  (Tr. 286.)  In the area of acquiring and using information, Ms. Bencha concluded that Claimant had "no problem" comprehending oral instructions; a "slight problem" in providing organized oral explanations and adequate descriptions; an "obvious problem" in understanding school and content vocabulary, understanding and participating in class discussions, learning new material, and recalling and applying previously learned material; and a "serious problem" in reading and comprehending written material, comprehending and doing math problems, expressing ideas in written form and applying problem-solving skills in class discussions.  (Tr. 287.)  She did not assign Claimant the most severe rating, a "very serious problem," in any area.  (*Id*.)  She noted that Claimant "needs peer tutoring or adult supervision for activities at the 4th grade level.  He can do work independently if it's at a 2nd grade level."  (*Id*.)

In the area of attending and completing tasks, Ms. Bencha reported that

12

Claimant had "no problem" paying attention when spoken to directly, sustaining
attention during play/sports activities, waiting to take turns, and organizing his own
things or school materials; a "slight problem" in changing from one activity to another
without being disruptive (weekly), and working without distracting himself or others
(monthly); an "obvious problem" in refocusing to a task when necessary (weekly),
carrying out single-step instructions (daily), completing work accurately without careless
mistakes (no frequency specified), and working at a reasonable pace/finishing on time
(weekly); a "serious problem" in focusing long enough to finish an assigned activity or
task (weekly); and a "very serious problem" in carrying out multi-step instructions (daily),
and completing class/homework assignments (daily).  (Tr. 288.)  She noted that
Claimant received daily assistance from special education teachers, and that she
frequently had Claimant work with a peer tutor or in a group if she felt he would
struggle.  (*Id*.)  She also modified assignments and gave him extended time to
complete them.  (*Id*.)

     In the area of interacting and relating with others, Ms. Bencha noted that
Claimant had "no problem" in asking permission appropriately, relating experiences and
telling stories, and using language appropriate to the situation and listener; a "slight
problem" in playing cooperatively with other children (no frequency specified), making
and keeping friends (no frequency specified), following rules (no frequency specified),
respecting/obeying adults in authority (weekly), introducing and maintaining relevant
and appropriate topics of conversation (weekly), taking turns in conversation (weekly),
interpreting meaning of facial expressions and body language (weekly) and using
adequate vocabulary and grammar to express thoughts and ideas in everyday

13

conversation (weekly); an "obvious problem" in seeking attention appropriately (weekly); and a "very serious problem" in expressing anger appropriately (daily).  (Tr. 289.)  She reported that a listener could almost always understand Claimant's speech.  (Tr. 290.)[4]

Ms. Bencha opined that Claimant had no problems in moving about and manipulating objects.  (Tr. 290.)  With respect to caring for himself, she noted that Claimant had "no problem" in taking care of his personal hygiene, caring for his physical needs (e.g., eating and dressing), taking his medications, and using good judgment regarding personal safety and dangerous circumstances; a "slight problem" being patient when necessary (daily), identifying and appropriately asserting emotional needs (no frequency noted), and using appropriate coping skills to meet daily demands of the school environment (weekly); an "obvious problem" responding appropriately to changes in his own mood (daily), and knowing when to ask for help (daily); and a "very serious problem" in handling frustration appropriately (daily).  (Tr. 291.)

Claimant's report cards from the 2010-2011 school year, when Claimant was in fifth grade, reflect that Claimant generally received C's in reading and writing, with his teacher assigning him a 2 (meaning, "emerging; demonstrates beginning awareness of skills/concepts however needs teacher support") in reading process ("[d]emonstrates comprehension skills and strategies"), reading application ("[r]eads and responds to" fiction and nonfiction texts) vocabulary ("[a]pplies reading strategies to identify new words") and phonemic awareness ("[u]ses strategies to decode new words") during the

---

[4]   Although Ms. Bencha provided further comments regarding Claimant's
      abilities in the area of interacting and relating with others, they are not legible
      in the administrative transcript.

final two grading periods of the academic year.  (Tr. 749.)  Claimant received C's in writing, and improved from a 2 to a 3 (meaning, "progressing; demonstrates understanding of skills/concepts but not yet consistently") in writing process ("[u]ses writing process (prewriting, drafting, revising, editing, publishing) with assistance"), writing applications ("[c]an write for a variety of purposes and audiences"), conventions ("[u]ses appropriate writing conventions . . . and growing writing vocabulary of appropriately spelled words"), research ("[k]nows how to gather information on a topic using different tools and communicates what is found"), and communication ("[d]elivers presentations on different topics for different types of audiences").  Claimant received similarly improved scores in all components of mathematics, science and social studies. (Tr. 749-50.)  At the conclusion of the school year, his teacher noted:

> [Claimant] has made major improvements with his behavior and academics this year.  He must work on basic math facts as well as math and reading skills over the summer.  It's been a pleasure to see [Claimant] progress over the school year.

(Tr. 751.)

### D.    Agency Assessments

On August 7, 2009, David V. House, Ph.D., examined Claimant at the request of the state agency.  (Tr. 445-48.)  Dr. House observed that Claimant was not limited in concentration and attention, was persistent and worked at an adequate pace, and tried to complete the tasks Dr. House presented to him.  (Tr. 447.)  Claimant reported difficulty sleeping, nightmares, and worrying that "people will disappear." (*Id.*)  He stated that he had tried to kill himself with a knife several weeks prior, but denied having any intention of hurting himself at the time of the examination.  (*Id.*)  Dr. House

15

diagnosed Claimant with bipolar disorder, not otherwise specified, based on "significant vegetative features including sleep and appetite disturbance along with significant mood swings and an apparent suicide attempt without expectation of death."  (Tr. 447-48.) He opined that Claimant functioned at three-quarters of average functioning for a child his age in pace, persistence and task completion, along with concentration and attention; at one-half functioning in social, emotional and behavioral patterns; two-thirds functioning in intellectual skills; three-quarters functioning in speech skills; and three-quarters functioning in motor skills.  (Tr. 448.)

On February 8, 2010, an Applewood psychology assistant completed an agency assessment form, in which she noted that she had been working with Claimant for five months as his behavioral/mental health counselor.  (Tr. 539.)  She reported that Claimant was depressed, experienced mood swings and attempted to harm himself and others when he was upset.  (*Id.*)  She observed that Claimant had limited ability to relate to his peers and to establish and maintain friendships, and that he was easily angered, which affected his ability to work with others.  (*Id.*)  The psychology assistant noted that Claimant did not respond well to criticism, and required one-on-one assistance to calm down and prevent him from hurting himself and others.  (*Id.*)  She reported that he enjoyed playing basketball.  (Tr. 540.)  According to the psychology assistant, although Claimant had previously been making progress with treatment, Claimant's behavior had worsened in the preceding weeks, and he had grown increasingly non-compliant at school.  (Tr. 541, 42.)

In a May 2010 child disability evaluation form, agency consultants opined that Claimant had less than marked limitations in acquiring and using information, attending

16

and completing tasks, and interacting and relating with others; no limitation in moving about and manipulating objects, and in his health and physical well-being; and marked limitations in caring for himself.  (Tr. 586-87.)

### E.    Hearing Testimony

At his August 12, 2011 administrative hearing, Claimant testified as follows:

He was 12 years old and about to start the sixth grade.  (Tr. 39.)  He had done "okay" in school the year before, earning C's, and his favorite teacher was his special education teacher, who taught him science and math.  (*Id*.)  He played basketball, football, baseball, soccer and tennis.  (Tr. 40.)  He planned on trying out for the football team.  (Tr. 42.)  The year before, he had played football, but had not completed the season because he injured his arm when he punched a window after his older brother angered him.  (Tr. 43-44.)  The wound required 50 stitches to close.  (Tr. 45.)  Claimant played basketball for his school as well.  (Tr. 45-46.)  He got along with his teammates and his coach.  (Tr. 46.)

Claimant was attending weekly therapy at Beech Brook, and he felt like it was helping him.  (Tr. 47-48.)  When Claimant got angry, he "shut down" and wouldn't listen to his mother or his brother.  (Tr. 48.)  He spent the summer playing with his friend, Eric, with whom he went outside and rode bikes.  (*Id*.)  He had just spent the night at Eric's house, where they had played video games.  (Tr. 49.)  Claimant spent time on Facebook, where he had 111 friends.  (Tr. 50.)  At school, he had friends with whom he ate lunch.  (Tr. 50-51.)  Claimant could prepare sandwiches for himself and knew how to make fried chicken.  (Tr. 51-52.)  He enjoyed playing his portable video game system and performed chores at home each night.  (Tr. 52-53.)  Claimant's mother helped him

17

with his homework each night.  (Tr. 54.)  He enjoyed reading comic books and books about basketball.  (*Id.*)

Claimant thought that he was at the hearing because of his anger issues and because he had threatened to kill himself.  (Tr. 55.)  He "sometimes" thought about killing himself.  (*Id.*)  In April 2011, he had taken a knife and cut his arm after his mother and brother made him angry.  (Tr. 55-56.)  He also accidentally broke a glass coffee table while he was wrestling with his younger brother.  (Tr. 57.)

Claimant had good days and bad days.  (Tr. 58.)  On a good day, he got out of bed, made his own breakfast, went to school, did his homework and played outside, or had his friend Aaron over to his house.  (Tr. 58-59.)  On good days, he listened to his mother.  (Tr. 59.)  On bad days, he didn't listen to her.  (*Id.*)  On a bad day, he didn't want to see anyone, be told what to do, or do his homework.  (Tr. 59.)  He "shut down at school" on bad days.  (*Id.*)  Claimant had three good days each week.  (Tr. 59-60.) On the other days, he "blank[ed] out on people," meaning he couldn't control his anger and would curse at his siblings and classmates.  (Tr. 60-61.)  Claimant had been punished for fighting five or six times during the prior school year.  (Tr. 62.)  He had also been suspended for threatening a teacher, cussing at her, and walking out of her classroom.  (Tr. 65.)  He thought about hurting himself approximately one time each month.  (Tr. 62.)

Plaintiff testified as follows at Claimant's administrative hearing:

Claimant's testimony that he hung out with people other than his friend Aaron was not accurate.  (Tr. 70.)  If Claimant wasn't with Aaron, he was "basically in the house."  (*Id.*)  Claimant's breaking of the coffee table was not an accident, as Plaintiff

18

had witnessed him pick up his younger brother and slam him into the glass table.  (Tr. 71.)  In April 2011, Claimant grew enraged when his older brother asked him to sweep up a pile of trash in the kitchen floor, and had chased his brother through their house with a knife before locking himself in his bedroom.  (Tr. 72.)  In his room, he had smashed a hole in the wall with his head.  (*Id*.) Plaintiff called the police, who had to push in Claimant's bedroom door, restrain him and take away the knife.  (*Id*.)  Claimant had struggled with the police officers.  (*Id*.)

Claimant experienced four or five "moods" each day, during which he was angry and defiant.  (Tr. 73.)  When his mood was severe, Claimant would try to harm himself or his siblings.  (73-74.)  Plaintiff called the police approximately twice a month due to Claimant's behavior.  (Tr. 74.)  Claimant tried to harm himself weekly.  (Tr. 76.)  Claimant required constant supervision and prodding to finish his chores, which involved "a lot of fussing, a lot of cussing, a lot of stamping around the house, slamming doors, pushing people out of the way."  (Tr. 77.)  Although Claimant was on Facebook, he didn't have 111 friends, but, rather, spent his time playing games and posting about football and basketball games.  (Tr. 77-78.)

Plaintiff sought help for Claimant because he was overeating and depressed, and because he told her that a voice in his sleep had told him to kill himself.  (Tr. 79.)  Staff at Claimant's school had told her that he was throwing temper tantrums and flipping desks and tables at school.  (Tr. 80.)  For the year prior to the hearing, Claimant had been undergoing therapy three times each week.  (Tr. 82.)  She did not feel that he was making progress, as Claimant would improve and then deteriorate.  (Tr. 82-83.)  He was defiant at school, talking back to teachers and slapping items off of tables and

desks.  (Tr. 83.)  Claimant received one-on-one assistance during the school day.  (Tr. 84.)

Plaintiff assisted Claimant with his homework each night, and it took them one to two hours to complete a single sheet of math problems, or to review 10 to 15 spelling or vocabulary words.  (Tr. 87-88.)  Claimant had difficulty sleeping, as he had nightmares and stayed awake all night.  (Tr. 88-89.)  Although Claimant would dress himself, Plaintiff had to remind him to brush his teeth and wash his face each day.  (Tr. 89.)  Claimant required constant supervision, and Plaintiff had gone from working full time to working part time to be more involved and because "someone has to be around him at all times." (Tr. 90.)  Plaintiff didn't believe that the medication was helping Claimant.  (Tr. 91-92.)

### III.    STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if he has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the

20

child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

21

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Claimant was born on April 12, 1999.  Therefore, he was a school-age child on April 14, 2009, the date the application was filed, and is currently a school-age child.

2.    Claimant has not engaged in substantial gainful activity since April 14, 2009, the application date.

3.    Claimant has the following severe impairments: mood disorders and oppositional defiant disorder.

4.    Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.  Claimant has a less than marked limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and the ability to care for himself; and no limitation in moving about and manipulating objects, and health and physical well-being.

6.    Claimant has not been disabled, as defined in the Act, since April 14, 2009, the date the application was filed.

(Tr. 17-26.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of*

22

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  *Id.*  However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

**B.      Plaintiff's Assignments of Error**

Plaintiff argues that there is insufficient evidence to support the ALJ's conclusions that: (1) Claimant had "less than marked" limitations in: (a) acquiring and using information; (b) attending and completing tasks; (c) interacting and relating with others; and (d) caring for himself; and (2) Claimant's impairments fail to meet the listing requirement for mood disorder (112.04).  The Commissioner argues that substantial evidence supports the ALJ's conclusions.

**1.      Whether Substantial Evidence Supports the ALJ's Conclusions Regarding Claimant's Functional Limitations**

In determining whether the ALJ's factual findings are supported by substantial evidence, courts must examine the evidence in the record taken as a whole and take

23

into account whatever in the record fairly detracts from its weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### a.    Acquiring and Using Information

In assessing a claimant's functioning in the domain of acquiring and using information, the agency considers "how well [a claimant] acquire[s] or learn[s] information, and how well [a claimant] use[s] the information [he has] learned."  20 C.F.R. § 416.926a(g).  The regulations offer the following examples of limited functioning in this domain: difficulty recalling important things learned in school the day before, difficulty solving mathematics questions or computing arithmetic answers, or talking only in short, simple sentences and difficulty explaining one's meaning.  20 C.F.R. § 416.926a(g)(3)(iii)-(v).  These examples, however, are not exhaustive, and do not necessary describe the degree of limitation in the domain at issue.  20 C.F.R. § 416.926a(g)(3).

The ALJ concluded that Claimant had less than marked limitations in acquiring and using information.  (Tr. 22.)  The ALJ noted that, although Ms. Bencha's May 2010 report reflected several serious problems in this domain during Claimant's fourth grade year, Claimant maintained a C average while receiving special education assistance during his fifth grade school year, and that "progress notes also show improvement since [the May 2010] opinion."  (Tr. 22.)  Plaintiff points to other evidence in the record – including the May 2010 teacher's report – that reflect that Claimant had serious limitations in this area, and argues that the ALJ did not cite to any evidence to support

his conclusion that progress notes reflect improvement in this domain.  The Commissioner points to Claimant's testimony that he earned C's in school and to evidence that Claimant's mother and teacher noted improvements in his school performance to argue that substantial evidence supports the ALJ's conclusion.

Here, substantial evidence supports the ALJ's conclusion that Claimant's limitations in this area were less than marked.  The school report card in the record reflects that Claimant earned C's in most of his classes during his fifth grade year.  (Tr. 39, 749-50.)  During the first two grading periods, Claimant's fifth grade teacher assigned a rating of 2 to Claimant's progress in various areas related to writing and reading, reflecting that he was demonstrating "beginning awareness of skills/concepts," but required "teacher support."  (Tr. 748-49.)  At the end of the school year, Claimant had either maintained the same level of progress or had improved to a rating of 3, indicating that he was demonstrating "understanding of skills/concepts, but not yet consistently."  (Tr. 749-50.)  During the final two grading periods, Claimant's teacher did not assign a rating of 1 – meaning that the student "need[ed] improvement" and was "not making adequate progress towards grade level expectations" – in any of the areas outlined in the report card.  (Tr. 748-50.)  In her final comments, Claimant's fifth grade teacher noted that he had "made major improvements in his behavior and academics" and suggested only that he "work on basic math facts as well as math and reading skills over the summer."  (Tr. 751.)

Plaintiff argues that the May 2010 report from Ms. Bencha reflects that Claimant had marked limitations in acquiring and using information, and that Claimant's psychological issues also created marked limitations in this domain.  However, the

25

evidence cited by Plaintiff does not fairly detract from the ALJ's conclusion on this issue.  The May 2010 report predates the report card from Claimant's fifth grade school year.  Accordingly, it was reasonable for the ALJ to conclude that Claimant's ability in this domain had improved over time.  Further, although the record reflects that Claimant's anger issues and defiant behavior increased and intensified at times, Plaintiff points to nothing in the record demonstrating that those issues affected Claimant's abilities in acquiring and using information, particularly during the time period addressed by the reports cards from Claimant's fifth grade year.   Accordingly, substantial evidence supports the ALJ's conclusion that Claimant had less than marked limitations in the area of acquiring and using information.

### b.    Attending and Completing Tasks

The domain of attending and completing tasks involves "how well [a claimant] is able to focus and maintain . . . attention, and how well [he] begin[s], carr[ies] through, and finish[es] . . . activities, including the pace at whici [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h).  Examples of limitations in this domain include, but are not limited to, being easily startled, distracted or overreactive to sounds, sights, movements or touches; being slow to focus on, or fail to complete activities of interest; becoming repeatedly sidetracked from activities or frequently interrupting others; being easily frustrated and giving up on tasks; and requiring extra supervision to remain engaged in an activity.  20 C.F.R. § 416.926a(h)(3)(i)-(v).  These examples do not describe a specific degree of limitation in this domain.  20 C.F.R. § 416.926a(h)(3).

In determining that Claimant was less than markedly limited in attending and

26

completing tasks, the ALJ acknowledged Ms. Bencha's opinion that Claimant had a serious problem focusing long enough to complete tasks and a very serious problem completing assignments and carrying out multi-step problems.  (Tr. 23.)  However, the ALJ reasoned that Ms. Bencha had formed her opinions "while [C]laimant was just starting on Adderall, and later evidence shows that he is able to focus better."  (*Id*.)  The ALJ pointed to the January 2011 review of Claimant's ISP at Beech Brook.  (*Id*.) Plaintiff argues that the ALJ's conclusion is not supported by substantial evidence because the record reflects that Claimant had been taking Adderall since "the end of 2009," and Ms. Bencha completed her assessment of Claimant in May 2010.  Plaintiff also contends that, in addition to Ms. Bencha's report, other evidence in the record – the January 2009 ISP review and Dr. Eppright's diagnosis of ADHD – reflect that Claimant has greater limitations in this domain than determined by the ALJ.  The Commissioner again points to Claimant's testimony that he earned C's in school and to evidence that Claimant's mother and teacher noted improvements in his school performance to argue that substantial evidence supports the ALJ's conclusion.

As a preliminary matter, the record reflects that Claimant likely began taking Adderall in late October or early November 2009, after Plaintiff discussed her concerns regarding the medication with Dr. Eppright.  (Tr. 480, 488.)  Accordingly, when Ms. Bencha completed her report regarding his abilities in May 2010, Claimant had been taking the medication for approximately eight months.  There is no information in the record regarding the length of time before Adderall is effective.  Thus, the ALJ's reasoning on this specific point – which implies that Claimant's medication was not yet influencing his behavior and concentration when Ms. Bencha completed her report – is

27

somewhat questionable.  However, even if this reasoning lacks support in the record, it does not require remand in this case, as other evidence in the record supports the ALJ's conclusion that Claimant's ability to focus improved after May 2010.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (noting that "when 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game'")) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).  For example, in Beech Brook's January 2011 ISP review, staff noted that Claimant was "doing consistently well at home and in school,"  was "compliant with home and school rules," and was "displaying more positive behaviors at home and in school, and received positive responses from his mother consistently."  (Tr. 682, 683.)  Further, Claimant's fifth grade report card reflects that his teacher assigned him satisfactory and superior ratings in the areas of completing class work on time, turning in completed homework on time, completing work accurately and neatly, and working independently.  (Tr. 750.) [5]

To support her argument that the ALJ's decision is not supported by substantial evidence, Plaintiff points to other evidence in the record, including Claimant's diagnosis of ADHD, reflecting that Claimant had difficulty concentrating and completing his school work.  However, even if this evidence constituted substantial evidence in support of the

---

[5]  According to Plaintiff, because the ALJ assigned "great weight" to Ms. Bencha's opinion, the ALJ erred in declining to adopt her conclusions regarding Claimant's abilities in attending and completing tasks.  However, there is no requirement that an ALJ accept every facet of an opinion to which he assigns significant or substantial weight.  Here, given that other, more recent evidence reflected that Claimant's ability to focus had improved after May 2010, substantial evidence supports the ALJ's decision that Claimant was less limited Ms. Bencha opined in this domain.

conclusion that Claimant was markedly limited in his ability to attend and complete tasks, it would still not be necessary to remand this case, as the ALJ's conclusion is supported by substantial evidence.  *See* *Ealy*, 594 F.3d at 512 ("If the Commissioner's decision is based upon substantial evidence, we must affirm, even if substantial evidence exists in the record supporting a different conclusion.").  Further, although Dr. Eppright diagnosed Claimant with ADHD, that diagnosis alone is not sufficient to establish that Claimant was markedly limited in this domain because Dr. Eppright did not opine regarding the severity of Claimant's limitations as a result of that diagnosis. *See* 20 C.F.R. § 416.927(d)(1); *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986).  Accordingly, substantial evidence supports the ALJ's conclusion that Claimant was less than markedly limited in his ability to attend and complete tasks.

### c.    Interacting and Relating with Others

To assess a claimant's functioning in the domain of interacting and relating with others, the agency considers "how well [a claimant] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his] community, cooperate[s] with others, comp[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others."  20 C.F.R. § 416.926a(i).  Examples of limitations in this domain, which do not necessarily describe a specific degree of limitation, include having no close friends, or having friends who are all older or younger than then claimant; avoiding or withdrawing from people the claimant knows, or being overly anxious or fearful of meeting new people or trying new experiences; difficulty

playing games or sports with rules; difficulty communicating with others, such as in using verbal and nonverbal skills for expression; difficulty speaking intelligibly or with adequate fluency.  20 C.F.R. 416.926a(i)(3)(ii)-(vi).

In deciding that Claimant was less than markedly limited in the domain of interacting and relating with others, the ALJ acknowledged evidence of Claimant's anger issues in the record:

> His teacher opined that he had a very serious problem with anger, which is well documented in the record.  She reports no other serious problems, and [Claimant's] disciplinary record indicates that he goes months without major incidents.  While in the hospital, [Claimant] was social, polite and cooperative.

(Tr. 24.)  Plaintiff contends that substantial evidence in the record demonstrates that Claimant has greater limitations in this domain than determined by the ALJ.  She points to evidence in the record that Claimant argued with authority figures, was disciplined for fighting and defying his teachers at school, had few close friends and had threatened harm to his siblings.  Plaintiff also notes state agency reports opining that Claimant had problems establishing and maintaining friendships, and functioned at half of a normal child's capability in social functioning.

This issue presents a close question in this case, as there is ample evidence in the record that Claimant has trouble controlling his angry outbursts and is defiant of his mother and other authority figures.  However, substantial evidence supports the ALJ's conclusion that, although there were issues in interacting and relating with others, Claimant was not markedly limited in this domain.  *See Ealy*, 594 F.3d at 512.  In her May 2010 report, Ms. Bencha noted Claimant had a "very serious problem" in expressing anger appropriately and an "obvious problem" in seeking attention

appropriately.  (Tr. 289.)  However, she also determined that Claimant had either a "slight problem" or "no problem" in the remaining 11 areas of inquiry in this domain, including in playing cooperatively with other children, making and keeping friends, taking turns in a conversation and interpreting non-verbal cues such as facial expressions and body language.  (*Id.*)  The records from Claimant's treatment at Fairview reflect that he participated and cooperated in therapy, that he interacted appropriately with other patients and his therapists, and that he was polite and helpful. (Tr. 704-05.)

Further, the evidence cited by Plaintiff does not fairly detract from the ALJ's conclusion that Claimant was less than markedly limited in this domain.  Plaintiff points to the February 2009 report prepared by Dr. House, who opined that Claimant was limited in his social functioning, and his ability to establish and maintain friendships. However, the ALJ relied on the report from Ms. Bencha and the Childhood Disability Evaluation Form, each of which was completed in May 2010, after Claimant started taking medication and had undergone counseling and behavioral therapy.  (Tr. 21, 24.) The ALJ assigned moderate weight to Dr. House's report for this very reason, noting that, while the opinion was consistent with Dr. House's notes, the rest of the record showed that Claimant had improved after the date of Dr. House's examination.  (Tr. 21.) Further, although Claimant had a history of disciplinary problems at school involving fights and defying his teachers, and of threats of harm to his siblings, there is no evidence in the record that establishes that these issues interfered with Claimant's functioning in this domain.  Rather, in his testimony – which the ALJ concluded was credible – Claimant testified that he had friends with whom he spent time, and that he

31

played team sports for his school and local community center.  (Tr. 48-49.)

Accordingly, although there is evidence in the record that Claimant experienced anger issues and had trouble controlling his emotional outbursts, substantial evidence in the record supports the ALJ's conclusion that Claimant was less than markedly limited in this area.

### d.      Caring for Yourself

In assessing whether a claimant has limitations in the domain of caring for one's self, the agency considers "how well [the claimant] maintains a healthy emotional and physical state, including how well [he] get[s his] physical and emotional wants and needs met in appropriate ways; how [the claimant] cope[s] with stress and changes in [his] environment; and whether [he] take[s] care of [his] own health, possessions and living area."  20 C.F.R. § 416.926a(k).  This domain involves the claimant's ability to "regulate [himself] . . . to respond to changes in [his] emotions and the daily demands of [his] environment to help [himself] and cooperate with others in taking care of [his] personal needs, health and safety.  It is characterized by a sense of independence and competence."  20 C.F.R. § 416.926a(k)(1)(i).  According to the regulations, caring for one's self effectively requires "employ[ing] effective coping strategies, appropriate to [the claimant's] age, to identify and regulate . . . feelings, thoughts, urges and intentions."  20 C.F.R. § 416.926a(k)(1)(iii).

The ALJ pointed to Claimant's testimony that he cooks meals for himself, enjoys playing basketball with others, uses a computer and likes to read, and does not actually harm himself to determine that Claimant was less than markedly limited in his ability to care for himself.  (Tr. 25.)  The Commissioner relies on this same evidence – as well as

32

Claimant's testimony that he cleaned his room, completed his chores and took care of his personal hygiene needs –  to assert that the ALJ's decision is supported by substantial evidence.  Plaintiff argues that the record contains substantial evidence to support the conclusion that Claimant was at least markedly limited in his functioning in this domain, pointing to evidence that Claimant "shuts down" at school, throws temper tantrums, struggles to manage his depression, harms himself and has difficulty controlling his emotions.

The ALJ's conclusion that Claimant is less than markedly limited in this domain is not supported by substantial evidence.  The evidence cited by the ALJ and the Commissioner generally reflects that Claimant is capable of caring for his physical wants and needs.  However, a claimant's ability to address his physical needs is only one area of inquiry in this domain.  The domain also encompasses claimant's ability to address his emotional wants and needs:

> Children must learn to recognize and respond appropriately to their feelings in ways that meet their emotional wants and needs; for example, seeking comfort when sad, expressing enthusiasm and joy when glad, and showing anger safely when upset. To be successful as they mature, children must also be able to cope with negative feelings and express positive feelings appropriately. In addition, after experiencing any emotion, children must be able to return to a state of emotional equilibrium. The ability to experience, use, and express emotion is often referred to as self-regulation. Children should demonstrate an increased capacity to self-regulate as they develop.

SSR 09-7p, 2009 WL 396029, *3 (Feb. 17, 2009).  The evidence cited by the ALJ to support his conclusion regarding Claimant's limitations in this domain does not correspond to the issues relevant to a claimant's ability to address his emotional wants and needs, as described in SSR 09-7p.

33

Further, the ALJ failed to address the evidence in the record regarding this issue. The administrative transcript is replete with evidence reflecting that Claimant experienced intense emotional outbursts, threw tantrums, threatened to harm himself, actually harmed himself, defied authority figures and struggled to control his anger and frustration.  (Tr. 541, 542, 716, 721, 723, 737-39.)  In her May 2010 report, Ms. Bencha noted that Claimant had "very serious problem" handling frustration appropriately, and that he experienced that problem on a daily basis.  (Tr. 291.)  That same month, agency consultants opined that Claimant was markedly limited in this domain, noting Claimant's history of suicidal ideations, self-harm and worsening behavior at school. (Tr. 587.)   In April 2011, Claimant locked himself in his room and threatened to harm himself with a knife after an altercation with his older brother, which resulted in a week-long admission to Fairview.  (Tr. 694.)  At Fairview, the therapist opined that Claimant had severe impairments in stress management, relationship skills, assertiveness and self expression.  (Tr. 707-08.)  In June 2011, staff at Beech Brook noted that, although Claimant had previously made progress in controlling his emotions and dealing with frustration, Claimant's angry outbursts and aggressive feelings had increased in intensity and frequency.  (Tr. 737.)  Beech Brook staff reported that Claimant was having "significant trouble controlling his emotions, his anger and his aggressive and destructive behaviors," and noted that physicians at Fairview had increased Plaintiff's dosages of Adderall and Abilify.  (Tr. 736, 739, 741.)  At his administrative hearing, Claimant testified that he had stopped playing football because he injured himself when he punched a window after his brother made him angry. (Tr. 43-44.)  The wound

required 50 stitches to close. (Tr. 44.)[6]

Although an ALJ is not required to discuss every piece of evidence in the record, *see Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2010), here, the ALJ's discussion of Claimant's limitations in this domain is fairly devoid of any mention of Claimant's anger and aggression issues, or, generally, his ability to control his emotions and respond to stressful situations. In other words, the ALJ failed to discuss all of the relevant areas of inquiry in the domain of caring for one's self, despite the fact that the record contained evidence relevant to Claimant's abilities in this domain. *See* SSR 09-7p, 2009 WL 396029 at *2 ("In the domain of 'Caring for yourself,' we consider a child's ability to maintain a healthy *emotional* and physical state. This includes: how well children get their *emotional* and physical wants and needs met in appropriate ways; *how children cope with stress and changes in the environment*; and how well children take care of their own health, possessions, and living area.") (emphasis added). Further, the evidence cited by Plaintiff fairly detracts from the ALJ's conclusion on this point. Unlike evidence relevant to the other areas of functioning, evidence relevant to Claimant's ability to care for himself demonstrates a deterioration in his functioning in this area, even after receiving treatment. Accordingly, the ALJ's conclusion that Claimant was less than markedly limited in this area is not supported by substantial evidence.

Despite this error, however, remand is not necessary in this case. An

---

[6]   This testimony, as well as Claimant's testimony that he had cut himself with a knife in April 2011 (Tr. 55) contradicts the ALJ's conclusion that Claimant only thought about harming himself, but never actually did.

impairment functionally equals the Listings – and a child is disabled –  if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  Substantial evidence supports the ALJ's conclusion that Claimant had less than marked limitations in all of the other functional equivalence domains. Although she conclusorily argues that Claimant is extremely limited in caring for himself, Plaintiff points to nothing in the record that supports such a finding.  Agency consultants determined that Claimant was "markedly limited" in this domain.  (Tr. 587.)  Accordingly, if this case were remanded and the ALJ determined that Claimant was markedly limited in the domain of caring for himself, it would not change the outcome of his application. *See* *Kobetic*, 114 F. App'x at 173.

> **2.** **Whether Substantial Evidence Supports the ALJ's Conclusion that Claimant's Impairments Did Not Meet or Medically Equal Listing 112.04.**

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Claimant's major depressive disorder does not meet or medically equal Listing 112.04 in the Listing of Impairments ("Listings"), which sets forth the criteria for mood disorders.  20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ concluded that Claimant did not satisfy the criteria for paragraph B of Listing 112.04, which requires two of the following: marked impairment in age-appropriate cognitive/communicative function, marked impairment in age-appropriate social functioning, marked impairment in age-appropriate personal functioning, or marked difficulties in maintaining concentration, persistence or pace.  *Id.*  The ALJ determined that Claimant had less than marked impairments or difficulties in each of the relevant categories. (Tr. 18-19.)

In support of her argument on this issue, Plaintiff relies on the same evidence and analysis she cites to support her argument that the ALJ erred in finding that Claimant was less than markedly limited in each of the relevant domains of functioning. (*See* Plaintiff's Brief ("Pl. Br.") at 24 ("The analysis of [the paragraph B criteria] are [*sic*] set forth with their similar domains of functioning in Assignment of Error No. 1.").) However, with the exception of one domain of functioning, substantial evidence supports the ALJ's conclusion that Claimant was less than markedly limited in each of the relevant domains.  Even given the error with respect to one domain of functioning, because Listing 112.04 requires a marked limitation in at least two categories, substantial evidence supports the conclusion that Claimant did not meet the paragraph B criteria for Listing 112.04.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: January 14, 2013

37